IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| IRASEMA MENDEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 3:06-CV-432 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social | ) | |
| Security[1], | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

This matter is before the Court for review of the Commissioner of Social Security's decision denying Disability Insurance Benefits and Supplemental Security Income to Plaintiff, Irasema Mendez. For the reasons set forth below, the Commissioner of Social Security's final decision is **REVERSED** and this case is **REMANDED** for proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. section 405(g).

BACKGROUND

On November 5, 2002, Plaintiff, Irasema Mendez ("Mendez"),

---

[1]On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Michael J. Astrue, in his official capacity only, is substituted as the Defendant in this action.

applied for Social Security Disability Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. section 401 et seq. and Supplemental Security Insurance ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. sections 1381 et seq.  Mendez alleges her disability began on August 8, 2001, the date her left hand was crushed in an industrial accident.  The Social Security Administration denied her initial application and also denied her claims on reconsideration. On October 14, 2004, Plaintiff appeared with counsel at an administrative hearing before Administrative Law Judge ("ALJ") Steven J. Neary.  Testimony was provided by Plaintiff and Joseph Thompson (a vocational expert).  On November 4, 2005, ALJ Neary denied Plaintiff's DIB and SSI claims, finding that, during the period from August 8, 2001 (Mendez' alleged onset date) to November 4, 2005 (the date of the ALJ's decision), Mendez had not been under a "disability" as defined in the Social Security Act.

Plaintiff requested the Appeals Council review the ALJ's decision.  This request was denied. Accordingly, the ALJ's decision became the Commissioner's final decision.  *See* 20 C.F.R. § 422.210(a)(2005).  Plaintiff has initiated the instant action for judicial review of the Commissioner's final decision pursuant to 42 U.S.C. section 405(g).

DISCUSSION

Facts

Mendez was born on August 8, 2001. (Tr. 55).  Mendez alleges the

following impairments: amputation of the distal portion of digits #3 and #4 on the left hand, reflex sympathetic dystrophy ("RSD"), carpel tunnel syndrome, right cubital tunnel syndrome, depression, anxiety, and a pain disorder associated with both psychological factors and a general medical condition.  Mendez alleges that she has been disabled since August 8, 2001, the date her hand was crushed in an industrial accident.  (Tr. 55).  Mendez' education consists of a GED.  (Tr. 77).  Her past relevant work includes work as a housekeeper, press operator, and machine operator.  (Tr. 96).

The medical evidence of record establishes the following:

In June of 1999, Mendez was seen by Dr. Deric Park and Dr. Raymond Roos at the University of Chicago.  Mendez related a long history of problems dating back to May of 1996 when, while sewing at work, she experienced an abrupt onset of intense radiating pain, originating from the right ulnar aspect of the wrist up to her shoulder.  (Tr. 121).  The pain continued intermittently, and in spite of an unremarkable EMG in August of 1996, she was diagnosed with carpal tunnel syndrome.  (Tr. 121).  A repeat EMG was performed in February of 1997 which was also unremarkable.  (Tr. 121).  Nevertheless, she underwent carpal tunnel release on the right wrist in March of 1997.  (Tr. 121).  She reported temporary relief after the procedure, but she began to note more intense pain.  (Tr. 121).  She was eventually diagnosed with RSD.  (Tr. 121).

A psychological evaluation was performed in December of 1997 by Dr. Joyce Scully.  (Tr. 370-371).  According to Dr. Scully, Mendez produced a valid profile across a number of test measures.  (Tr. 370).

Her anxiety and depression were problematic for her, and her responses indicated that she was excessively worried and distracted by her current situation. (Tr. 370). She was spending an inordinate amount of time analyzing all the things that could possibly go wrong. (Tr. 370). She found that it was extremely difficult to think about anything else, and she experienced the world as a confusing and threatening place. (Tr. 370). She was worried about her future, especially her financial future. (Tr. 370). It was important for her to present a formal and good facade to others. (Tr. 370). Her scores on depression indicated that she was more depressed that the average patient. (Tr. 370). Anxiety and somatization were in the average range as compared with other pain patients, but both are beyond the range when compared to the community at large. (Tr. 370). She felt victimized and angry at those to whom she has sought help, and Dr. Scully opined that she is probably experiencing mounting frustration and periodic somatic distractions. (Tr. 370). Interpersonally Dr. Scully found that Mendez relates passively dependently. (Tr. 370). Her diagnosis was Pain Disorder associated with both psychological factors and a general medical condition (depression as a result of pain). (Tr. 370). Dr. Scully found that her depression and frustration exacerbate her pain, but did not cause the onset or maintenance of her pain. (Tr. 370). Dr. Scully found that most of her problems were reactive to her current situation. (Tr. 370). Dr. Scully also found that her early experience of abandonment and physical abuse may be interfering with some degree and slightly exacerbating her present situation. (Tr. 371).

In March of 1998 she underwent insertion of a spinal cord stimulator to address her RSD. (Tr. 121). In the preceding months, Mendez had noted progressive pain of her left upper extremity, particularly at the wrist, with movement and palpation. (Tr. 121). A review of symptoms was positive for depression and anxiety. (Tr. 121-122). It was noted that her past medical history was significant for depression due to the above problems and an ongoing legal battle with her place of employment. (Tr. 121-122). However, she denied previous hospitalization for depression or suicidal ideation. (Tr. 121-122). She was taking Zoloft and Vicodin at that time. (Tr. 121-122). On physical examination she had give-away weakness in all limbs. (Tr. 121-122). Assessment of her power was complicated by poor effort and pain, and she noted intense pain with movement of the left wrist and palpation of the left wrist. (Tr. 121-122). Although Mendez had been diagnosed with RSD, in the opinion of Doctors Park and Roos, Mendez's presentation in June of 1999 was not consistent with RSD. Doctors Park and Roos also questioned whether or not she was truly suffering from carpal tunnel syndrome. (Tr. at 122). They thought she probably suffered from cervical radiculopathy since her pain follows a radicular pattern and possibly joint disease since she demonstrated exquisite tenderness to movement of the wrist, particularly on the left side. (Tr. 123). The doctors noted that the pain was very reproducible on examination, and they did not doubt an "organic" cause to her pain. (Tr. 123). However, they wondered about the possibility of a psychological aspect to this discomfort. (Tr. 123). They decided to repeat an EMG/nerve conduction test looking for

evidence of radiculopathy, carpal tunnel syndrome, entrapment neuropathy, degenerative changes in the muscles, and evidence of RSD. (Tr. 123).  The EMG results were normal.  (Tr. 118).

In July of 1999 she was treated by Dr. Reneta Veriakojis in the pain clinic at the University of Chicago.  (Tr. 117).  Dr. Veriakojis administered a temporary sympathetic block which resulted in complete relief of Mendez's pain for five hours with increased temperature, but the relief was short-lived as the pain promptly returned after the effects of the local anesthetic dissipated.  (Tr. 117).  The possibility of a thoracoscopic sympathetctomy was discussed.  (Tr. 117).  The controversy regarding the diagnosis and therapy of RSD was also discussed, and it was noted that her consulting physicians could not reach agreement as to its presence.  (Tr. 117).

On April 3, 2000 Mendez was evaluated by Dr. Martin E. Gold, an orthopedic surgeon, for an opinion regarding her workers' compensation claim.  (Tr. 131-132).  Dr. Gold noted that Mendez had a complex case. (Tr. 131).  He recounted her history, and noted that she had returned to work in May of 1998 but had to stop again, and that she had just recently returned to work despite ongoing pain.  (Tr. 131).  Dr. Gold found that she had left carpal tunnel syndrome, right cubital tunnel syndrome, as well as RSD.  (Tr. 132).  For purposes of her worker's compensation claim, Dr. Gold estimated her permanent partial impairment of the person as a whole at 36 percent.  (Tr. 132).

Mendez was treated as Nasr Psychiatric Services from October of 2000 until May 30, 2001.  (Tr. 134-139).  It appears that she received no further treatment until August 8, 2001, the alleged onset date of

her disability.

On August 8, 2001 she was admitted to Memorial Hospital of South Bend for a crush injury to her left hand. (Tr. 146). She was wearing gloves and running a roller machine with an opening of only a few millimeters when her left hand was caught in the machine causing temporary entrapment, crush/rollover of the left index, long and ring fingers. (Tr. 146). She was able to extract her fingers manually. (Tr. 146). Mendez was hospitalized and surgical procedures were performed including revision amputation of her left long finger at proximal interphalangeal level, percutaneous pin stabilization left index finger, middle phalanx fracture; and closed reduction and percutaneous pinning longitudinal, left ring finger, middle and distal phalanx fractures. (Tr. 140). These surgeries were performed by Dr. Randolph Ferlic who noted a significant injury to her index, long, and ring finger with a potential need for additional surgeries including potential revision amputations. (Tr. 140).

Dr. Ferlic continued to treat Mendez through February 14, 2002. (Tr. 320-327). In November of 2001 he performed an additional surgical procedure due to pain from non union of the distal phalanx left ring finger. (Tr. 322). After her treatment with Dr. Ferlic, it appears from the record that Mendez sought no further treatment for approximately eleven months.

In January of 2002 she underwent a Functional Capacity Evaluation ("FCE"). (Tr. 219-228). The test results indicated that she was able to occasionally lift 20 pounds, frequently lift 10 pounds and constantly lift only a negligible weight. (Tr. 219). It was

estimated that she gave maximal effort which was supported by validity checks throughout the test. (Tr. 219). The recommendations were a return to light duty work, medical and behavioral intervention may be appropriate according to the findings of The Dallas Pain Questionnaire, and continue with HEP for improving left hand grip strength, hand function, and increasing active range of motion. (Tr. 219).

On January 13, 2003 she was seen by Dr. Thomas P. Barbour for consultative exam at the request of the Social Security Administration. (Tr. 328-330). She told Dr. Barbour that she had been unable to continue with normal activities at home and at work due to chronic neck pain that radiates into the right arm and chronic left shoulder pain that radiates into the left arm. (Tr. 328). She also reported having suffered with the problem of neck and right arm pain for about six years and the left arm about 5 years. (Tr. 328). She was at the time taking a variety of anti-inflammatory medications with minimal success. (Tr. 328). She told him that she had trouble doing yard work as well as light housework because the pain is increased with these movements. (Tr. 328). The pain was especially increased when she grips, pulls, or lifts any object. (Tr. 328). This included lightweight objects of 10 pounds or less. (Tr. 328). Her problems were complicated by the fact that she had traumatic loss of part of the distal phalanx on two digits of the left hand. (Tr. 328). This included the third and fourth digit of the left hand. (Tr. 328). She has had mild to moderate difficulty picking up coins and fastening buttons with the left hand. (Tr. 328). Mendez told Dr. Barbour about

her spinal simulator implanted in 1998. (Tr. 328). Dr. Barbour noted that, despite all of the above symptoms, Mendez did work up until the time of her traumatic injury, and then found that her job had been lost when the factory where she worked closed. (Tr. 328). However, during the time that she did work, Mendez reported that she missed perhaps one to three months per year due to difficulty with her upper extremities. (Tr. 328). On physical exam Dr. Barbour doctor noted that Mendez does have a loss of the distal portion of the digits of the left hand, #3 and #4. (Tr. 329). Her fine finger manipulative abilities were mildly impaired especially with the left hand, but the right hand seemed normal. (Tr. 329). Dr. Barbour's impression was chronic neck pain and right arm pain that interfered with her daily activities as did the carpal tunnel syndrome and reflex sympathetic dystrophy; chronic left arm pain; and loss of portions of two digits of the left hand which interferes with daily activities. (Tr. 329).

On January 10, 2003, a consultative psychological examination was performed at the request of the Social Security Administration by Dr. Jeffrey L. Fisher. (Tr. 331-334). Mendez told Dr. Fisher that she had become depressed after her problems with carpal tunnel syndrome and RSD, and that her depressed feelings increased following her subsequent accident in August of 2001. (Tr. 331). She reported that her appetite was poor as she had lost 10 pounds since November. (Tr. 331). She also attributed occasional sleep problems to pain. (Tr. 331). Mendez's daughter reported that Mendez was irritable and agitated. (Tr. 331). Mendez told the psychologist that she feels fatigued, and she had feelings of worthlessness, trouble

concentrating, and sometimes passive thoughts of death. (Tr. 331). At that time, Mendez was taking English classes six hours a week, three days a week through vocational rehabilitation. (Tr. 331-332). It was noted that she had outpatient therapy for depression once a week through Dr. Nasr's office from September of 2000 to April of 2001, when she quit therapy because her therapist was leaving. (Tr. 332). In the clinical interview Dr. Fisher found that Mendez had mild difficulty with active attention. (Tr. 333). He noted that her English comprehension was good. (Tr. 333). His diagnosis was adjustment disorder with depressed mood, chronic. (Tr. 333). He rated her current global assessment of functioning ("GAF") at 58. (Tr. 334). Additionally, Dr. F. Kladder and Dr. B. Blackman reviewed Mendez's medical records and found that Mendez's mental impairments were not severe. (Tr. 335).

The State agency doctors also reviewed Mendez's file, and did a Residual Functional Capacity Assessment. (Tr. 349-355). They found that Mendez could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for six hours in an 8-hour workday, sit for a total of about six hours in an 8-hour workday; occasionally climb, balance, stoop, kneel, crouch, and crawl, and was limited in handling and fingering. (Tr. 349-355).

Dr. Ferlic completed a Medical Source Statement form for Mendez on October 7, 2004. (Tr. 388-391). He found that Mendez could only occasionally lift and/or carry up to five pounds. (Tr. 388). He further found that Mendez was limited in reaching and handling and could only push and/or pull five pounds with her upper extremities.

(Tr. 389-390). Dr. Ferlic's Medical Source Statement was accompanied by a letter in which Dr. Ferlic noted that the best way to scientifically assess Mendez's work restrictions would be a functional capacity evaluation. (Tr. 387).

Mendez underwent a second consultative psychological evaluation on December 9, 2004 by Dr. John T. Heroldt. (Tr. 392-395). In a clinical interview she spoke in broken English and seemed to have some difficulty comprehending some tasks presented to her due to her grasp of the language, but not due to her psychological functioning. (Tr. 394). She had a hard time explaining what she wanted to say during the proverbs subtest of the Mental Status Exam. (Tr. 394). However, she understood simple tasks and completed them in an appropriate time frame. (Tr. 394). Dr. Heroldt's diagnosis was major depressive disorder, recurrent, moderate, in full remission. (Tr. 394). Dr. Heroldt rated Mendez's current GAF as 65, and found that she had no limitation in regard to her ability to do work-related mental activities. (Tr. 395-399).

Review of Commissioner's Decision

This Court has authority to review the Commissioner's decision to deny social security benefits. 42 U.S.C. § 405(g). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." *Id.* Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a decision." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In determining whether substantial

evidence exists, the Court shall examine the record in its entirety, but shall not substitute its own opinion for the ALJ's by reconsidering the facts or re-weighing evidence. *Jens v. Barnhart*, 347, F.3d 209, 212 (7th Cir. 2003). With that in mind, however, this Court reviews the ALJ's findings of law de novo and if the AlJ makes an error of law, the Court may reverse without regard to the volume of evidence in support of the factual findings. *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999).

As a threshold matter, for a claimant to be eligible for DIB or SSI benefits under the Social Security Act, the claimant must establish that he is disabled. To qualify as being disabled, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A) and  1382(a)(1).  To determine whether a claimant has satisfied this statutory definition, the ALJ performs a five step evaluation:

Step 1:   Is the claimant performing substantial gainful activity: If yes, the claim is disallowed; if no, the inquiry proceeds to Step 2.

Step 2:   Is the claimant's impairment or combination of impairments "severe" and expected to last at least twelve months?  If not, the claim is disallowed; if yes, the inquiry proceeds to Step 3.

Step 3:   Does the claimant have an impairment or combination of impairments that meets or equals the severity of an impairment in the SSA's Listing of Impairments, as described in 20 C.F.R. § 404, Subpt. P, App. 1?  If yes, then claimant is automatically disabled; if not, then the inquiry proceeds to Step 4.

```
Step 4:    Is the claimant able to perform his past relevant work?
           If yes, the claim is denied; if no, the inquiry proceeds to
           Step  5,  where  the  burden  of  proof  shifts  to  the
           Commissioner.

Step 5:    Is the claimant able to perform any other work within his
           residual functional capacity in the national economy: If
           yes, the claim is denied; if no, the claimant is disabled.
```

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v); *see also Herron v. Shalala*, 19 F.3d 329, 333 n. 8 (7th Cir. 1994).

In this case the ALJ found that Mendez suffers from severe impairments of a loss of function and use in her upper extremity resulting from an industrial accident. (Tr. 18-19). The ALJ further found that Mendez did not meet or medically equal one of the listed impairments, and could not perform any of her past relevant work, but nonetheless retained the residual functional capacity to perform light work with occasional postural limitations as well as limited gross and fine manipulation with her left hand consistent with partial amputation of ring and middle finger. (Tr. 19-20). Additionally, the ALJ found that Mendez is limited to jobs which do not require good oral communication skills. (Tr. 19). With these limits in mind, the ALJ found that there are jobs that exist in significant numbers in the national economy that Mendez can perform; namely, cashier; shipping receiving weigher, or car wash attendant. (Tr. 21). Thus, Mendez's claim failed at step 5 of the evaluation process. (Tr. 21). Mendez believes that the ALJ committed several errors requiring reversal, each of which will be addressed in turn.

Dr. Ferlic's Opinion

Social Security Ruling ("SSR") 96-2p provides that a treating physician's medical opinion must be given controlling weight if it is "well supported and not inconsistent with other substantial evidence in the case record." Furthermore, SSR 96-2p requires that the ALJ's "decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. Additionally, 20 C.F.R. §§ 404.1527(d)(2) and 416.927 (d)(2) establish six criteria that should be evaluated when determining the weight that should be given to a treating physician's opinion. See *Butera v. Apfel*, 173 F.3d 1049, 1056 (7th Cir. 1999). The six criteria are:

1) the nature and extent of the treatment relationship;
2) the degree to which the medical signs and laboratory findings support the opinion;
3) the degree to which the opinion takes into account all of the pertinent evidence in the record;
4) the persuasiveness of the opinion rendered;
5) the consistency of the opinion with the record as a whole;
6) the specialization of the physician.

20 C.F.R. §§ 404.1527(d)(2) and 416.927(a)-(d).

Dr. Ferlic is an orthopedic specialist, operated on Mendez twice, and saw Mendez about a dozen times in his office. (Tr. 320-327). That Dr. Ferlic was a treating physician within the meaning of SSR 96-2p is not disputed. Dr. Ferlic found that Mendez could only occasionally lift and/or carry up to five pounds. (Tr. 388). The ALJ acknowledged this (Tr. 19). However, his opinion reveals that he failed to give

-14-

this opinion controlling weight, for if he had, the result clearly would have been different. While, under certain circumstances, this would not be improper, if an ALJ chooses not to give a treating physician's opinion controlling weight, SSR 96-2p requires that he explain why he did not do so. ALJ Neary's opinion fails to adequately do this.

The Government argues that because even Dr. Ferlic agreed that Mendez maintains the ability to walk and stand, Mendez therefore possesses the ability to perform light work. Here, the Government is ignoring the fact that doing light work requires more than the ability to stand and walk: it also requires the ability to lift or carry objects weighing up to 10 pounds frequently. *See* SSR 83-19 ("The regulations define light work as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.").

The Government also argues that what Dr. Ferlic opined was that the best way to assess Mendez was through a functional capacity evaluation, that the record contains one, and that the evaluation says Mendez can do light work. This is all very reasonable, but it is not in the ALJ's opinion. Rather, it is the Government's post-hoc reasoning, not the ALJ's reasoning, and it does little to help subsequent reviewers of the ALJ's opinion assess his decision making process. While the ALJ's conclusion may be reasonable, whatever reasons the ALJ had for discounting Dr. Ferlic's opinion are not communicated to the reader through his opinion. This Court agrees with Mendez that, in this case, the ALJ failed to "connect the dots." Because this constitutes legal

error, this case must be remanded for further consideration.

Credibility Determination

Mendez claims that the ALJ failed to properly evaluate the credibility of her testimony. Because the ALJ is best positioned to judge a claimant's truthfulness, this Court will overturn an ALJ's credibility determination only if it is patently wrong. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). However, when a claimant produces medical evidence of an underlying impairment, the ALJ may not ignore subjective complaints solely because they are unsupported by objective evidence. *Schmidt v. Barnhart*, 395 F.3d 737, 745-47 (7th Cir. 2005). Instead, the ALJ must make a credibility determination supported by record evidence and be sufficiently specific to make clear to the claimant and to any subsequent review the weight given to the claimant's statements and the reasons for that weight. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003).

In evaluating the credibility of statements supporting a Social Security Application, this Circuit has noted that an ALJ must comply with the requirements of Social Security Ruling 96-7p. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). This ruling requires ALJ's to articulate "specific reasons" behind credibility evaluations; the ALJ cannot merely state that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." SSR 96-7p. Furthermore, the ALJ must consider specific factors when assessing the credibility of an individual's statement including:

1. The individual's daily activities;
2. The location, duration, frequency and intensity of the

-16-

            individual's pain or other symptoms;
3.    Factors that precipitate and aggravate the symptoms;
4.    The type, dosage, effectiveness, and side effect of any medications the individual takes or has taken to alleviate pain or other symptoms;
5.    Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
6.    Any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and
7.    Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p; *see also Golembiewski v. Barnhart,* 322 F.3d 912, 915-16 (7th Cir. 2003).

The ALJ's opinion states that Mendez's testimony was generally credible. (Tr. 20). The opinion states, specifically, that "the undersigned finds the claimant's [sic] generally credible as she wants to work and has been going to school on her own." (Tr. 20). The vocational expert testified that, if Mendez's testimony were credible, all employment would be precluded. (Tr. 458). "Based on the testimony and specifically a mention of problems with grip on the right and left, difficulty in using the hands and arms for any extended activities, I believe that would preclude any employment." (Tr. 458). Despite the vocational expert's testimony, the ALJ found that Mendez could perform light work with some limitations in handling, gingering, and oral communications. Accordingly, it is clear that the ALJ did not treat Mendez's testimony as fully credible, although the opinion contains little else explaining this decision. The decision merely states, "However, the undersigned finds that the claimant has the functional capacity to perform light work, which is consistent with the finding of the state agency and functional capacity evaluation." (Tr. 20). The explanation, for not treating Mendez's testimony as fully credible (if

-17-

it can be called an explanation at all) is inadequate. Even the Government's brief admits that the ALJ's credibility finding is quite brief. The facts of record *may* leave room for an ALJ to reach the conclusion that ALJ Neary reached. The problem here is not the conclusion, but the failure to set the analysis forward explicitly in the decision. Because the ALJ's decision, adopted by the Commissioner, committed an error of law, reversal is required irrespective of the volume of evidence that *may* support the finding of fact.

Other Arguments

Mendez also claims that the ALJ erred in failing to evaluate the impact of Mendez's psychological problems in combination with her underlying physical impairments, and that the ALJ did not properly evaluated her RSD under Social Security Ruling 03-2p. While the ALJ may have erred in these respects, the Court has already found reversible error regarding the ALJ's treatment of Mendez's treating physician's opinion and the ALJ's credibility determination. Accordingly, these arguments need not be considered here.

CONCLUSION

For the reasons set forth above, the Commissioner of Social Security's final decision is **REVERSED** and this case is **REMANDED** for proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. section 405(g).

**DATED:  August 10, 2007**               /s/RUDY LOZANO, Judge
                                          **United States District Court**